FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Aug 13, 2018

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| EMPIRE HEALTH FOUNDATION, for Valley Hospital Medical Center, | NO: 2:16-CV-209-RMP |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| THOMAS E. PRICE, M.D., Secretary of the United States Department of Health and Human Services, | |
| Defendant. | |

Plaintiff Empire Health Foundation ("Empire"), for Valley Hospital Medical Center (the "Hospital"), brings this action against the Secretary of the United States Department of Health and Human Services (the "Secretary"). Before the Court is Empire's Motion for Summary Judgment, ECF No. 34, and the Secretary's Cross-Motion for Summary Judgment, ECF No. 46. Theresa Sherman and Daniel Hettich appeared on behalf of Empire. James Bickford appeared on

behalf of the Secretary.  Having considered the parties' filings and oral argument, the remaining record, and the relevant law, the Court is fully informed.

This case concerns the validity of the Secretary's 2005 Final Rule promulgation with regard to the Secretary's interpretation of the phrase "entitled to benefits under [Medicare Part A]" in 42 U.S.C. § 1395ww.  Both parties have moved for summary judgment.  For the reasons set forth below, Empire's motion is granted in part and denied in part, and the Secretary's motion is denied.

## PROCEDURAL HISTORY

Effective October 1, 2004, the Secretary's 2005 Final Rule relating to Medicare Part A hospital coverage amended 42 C.F.R. § 412.106(b)(2) to reflect the Secretary's newly adopted policy regarding the assessment of Medicare Part A patient-days.  ECF No. 11-2.  The actual language of the 2004 amendment, which removed the word "covered" from 42 C.F.R. § 412.106(b)(2), appeared for the first time in the 2008 publication of the regulation.  *Id.*  Pursuant to the Medicare disproportionate share hospital ("DSH") reimbursement process, Wisconsin Physicians Services, the fiscal intermediary that was auditing the Hospital's cost reporting, applied the amended policy from the 2005 Final Rule to the Hospital's cost reporting period for the 2008 fiscal year.  ECF No. 34 at 14.  The Hospital timely filed an appeal with the Provider Reimbursement Review Board ("Board").  *Id.*

1     After filing its appeal, the Hospital sought expedited judicial review

2     pursuant to 42 U.S.C. § 1395oo(f)(1), which states that providers "shall also have

3     the right to obtain judicial review of any action of the fiscal intermediary which

4     involves a question of law or regulations relevant to the matters in controversy

5     whenever the Board determines . . . that it is without authority to decide the

6     question." *See* ECF No. 11-1.   Finding that it was without authority to decide the

7     legal issue in this case, the Board granted the Hospital's request for expedited

8     judicial review regarding whether the regulation, 42 C.F.R. § 412.106(b)(2), is

9     valid.  ECF No. 11-2.

10    Empire, on behalf of the Hospital, filed the complaint in this matter alleging

11    that the 2005 Final Rule amending 42 C.F.R. § 412.106(b)(2) is substantively and

12    procedurally invalid and that the agency should be enjoined from applying the

13    2005 Final Rule against the Hospital.  *See* ECF No. 1.  Empire moves for summary

14    judgment, challenging the Secretary's interpretation of the phrase "entitled to

15    benefits under [Medicare Part A]" as inconsistent with the plain language of the

16    statute, inconsistent with circuit precedent, and arbitrary and capricious.  ECF No.

17    34 at 20-30.  Empire also challenges the adequacy of the notice that the Secretary

18    provided prior to the promulgation of the 2005 Final Rule.  *Id.* at 17-20.

19    Alternatively, if the Court agrees with the Secretary regarding the treatment of

20    unpaid Medicare Part A days, Empire asks that the Court direct the Secretary "to

21

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 3

include unpaid [supplemental security income ('SSI')] eligible patient days in the numerator of the [Medicare fraction] utilizing SSI payment status codes that reflect the individuals' eligibility for SSI—even if the individuals did not receive SSI payments," as a matter of consistency. *Id.* at 23.

Empire also challenges the validity of the inclusion of Part C coverage days in the Hospital's 2008 fiscal year DSH calculation. *Id.* at 11. In a 2014 case, the D.C. Circuit Court of Appeals vacated the Medicare Part C regulatory revision on procedural grounds. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014). Accordingly, both Empire and the Secretary have agreed that this Court should remand the Part C issue back to the Board.

The Secretary also moves for summary judgment, arguing that the Court should find the Secretary's 2005 Final Rule substantively and procedurally valid.

## JURISDICTION

This case comes to the Court from the Provider Reimbursement Review Board, which hears appeals concerning DSH reimbursement payments to hospitals and other Medicare providers. The Board concluded that this case "involves a question of law or regulations" that it "is without authority to decide." *See* ECF No. 11-2 (citing 42 C.F.R. § 405.1842(f)(1), (g)(2)). Pursuant to 42 U.S.C. § 1395oo(f)(1), the Board granted expedited judicial review of the legal questions raised by the Hospital in its appeal, now being prosecuted by Empire. The Board

found that it "lacks the authority to decide whether regulation, 42 C.F.R. § 412.106(b)(2) is valid." ECF No. 11-2.

The Secretary disputes the Court's jurisdiction to hear Empire's challenge to the Secretary's assessment of SSI-entitlement. ECF No. 46 at 32. As the Court makes clear below, it finds that the Secretary's assessment of SSI-entitlement in the Medicare fraction of the disproportionate patient percentage provision is outside the scope of the Board's grant of expedited judicial review in this matter. *See infra* Part III. However, the Court has subject matter jurisdiction over the other questions of law presented in this matter pursuant to the Board's grant of expedited judicial review under 42 U.S.C. § 1395oo(f)(1), and pursuant to 28 U.S.C. § 1331, as a civil action arising under the laws of the United States, because Empire challenges the interpretation of a provision in the Medicare Act, 42 U.S.C. § 1395ww(d)(5)(F). *See* ECF No. 1.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

When parties file cross-motions for summary judgment, the Court considers each motion on its own merits. *See Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). A court may grant summary judgment where "there is no genuine dispute as to any material fact" of a party's prima facie case, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-33 (1986); *see also* Fed. R. Civ. P.

56(c).  Because Empire's claims arise under the Administrative Procedure Act

("APA"), 5 U.S.C. §§ 701-706, resolution of its claims "does not require fact finding

on behalf of [the] court."  *Nw. Motorcycle Ass'n v. USDA*, 18 F.3d 1468, 1471-72

(9th Cir. 1994).

Here, there are no disputed facts, and the Court's grant of jurisdiction is

limited to the legal question of the validity of 42 C.F.R. § 412.106(b)(2).

## STATUTORY AND REGULATORY FRAMEWORK

Under Part A of the Medicare Act, the Medicare program reimburses

providers for inpatient services based on the Prospective Payment System ("PPS"),

which derives reimbursements from standardized reimbursable expenditure rates

that are subject to adjustments based on certain hospital-specific factors.  *See* 42

U.S.C. §§ 1395c to 1395i-5, 1395ww(d).  The Hospital's challenge concerns the

DSH adjustment, created to "compensate hospitals for the additional expense per

patient associated with serving high numbers of low-income patients."  *Phoenix

Mem. Hosp. v. Sebelius*, 622 F.3d 1219, 1221 (9th Cir. 2010).  As alleged in the

complaint, the Hospital provided short-term acute care to patients insured under

the federal health insurance program Medicare in the 2008 fiscal year.  ECF No. 1

at 3.

Whether a hospital receives a DSH adjustment, and the amount of the

adjustment received, is determined by a calculation of the hospital's

disproportionate patient percentage ("DPP").  42 U.S.C. § 1395ww(d)(5)(F)(v),

(vii).  The DPP is the sum of two fractions, commonly referred to as the Medicare

fraction and Medicaid fraction.  The relevant statutory language for determining

the DPP is as follows:

> **(vi)** In this subparagraph, the term "disproportionate patient percentage" means, with respect to a cost reporting period of a hospital, the sum of—
> **(I)** the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were *entitled to benefits under part A of this subchapter* and were entitled to supplementary security income benefits (excluding any State supplementation) under subchapter XVI of this chapter, and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were *entitled to benefits under part A of this subchapter*, and
> **(II)** the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX, but who were not entitled to benefits under part A of this subchapter, and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi) (emphasis added).

The regulation implementing the DPP provision, 42 C.F.R. § 412.106(b), as

amended by the 2005 Final Rule, states the formula for determining the DPP,

which serves "as a proxy for all low-income patients."  *Legacy Emanuel Hosp. &

Health Ctr. v. Shalala*, 97 F.3d 1261, 1265 (9th Cir. 1996).  The formula is as

follows, represented visually:

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT, AND DENYING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT ~ 7

**Medicare Fraction**  **Medicaid Fraction**

$$\frac{Days\ Entitled\ to\ Medicare\ Part\ A\ and\ to\ SSI}{Days\ Entitled\ to\ Medicare\ Part\ A} + \frac{Days\ Eligible\ for\ Medicaid\ (but\ not\ entitled\ to\ Medicare)}{Total\ Patient\ Days} = DPP$$

*See* 42 C.F.R. § 412.106(b). "A higher DPP produces a higher adjustment percentage, which in turn produces a larger adjustment payment." *Metro. Hosp. v. United States HHS*, 712 F.3d 248, 251 (6th Cir. 2013) ("In sum, the DPP is the key figure in determining whether a hospital will receive additional Medicare dollars for serving low-income patients and, if so, in what amount.").

As referenced in the above equation, the numerator of the Medicare fraction consists of the number of patient-days in the relevant period for patients who were both "entitled to benefits under [Medicare] part A" and "entitled to [SSI] benefits." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). The relevant portion of the implementing regulation closely tracks the statute. It states that the Secretary calculates the DPP by determining the number of patient days that "[a]re associated with discharges occurring during each month" and "[a]re furnished to patients who during that month were *entitled to both Medicare Part A (including Medicare Advantage (Part C)) and SSI*, excluding those patients who received only State supplementation." 42 C.F.R. § 412.106(b)(2) (emphasis added). The Secretary then divides this number by the number of patient days that "[a]re associated with discharges that

occur during that period" and "[a]re furnished to patients entitled to Medicare Part A (including Medicare Advantage (Part C))". *Id.* § 412.106(b)(2).

**EMPIRE'S CHALLENGE TO THE VALIDITY OF 42 C.F.R. § 412.106(B)(2)**

As previously stated, the issue under expedited judicial review in this matter is the validity of 42 C.F.R. § 412.106(b)(2). *See* ECF No. 11-2. "[R]egulations, in order to be valid, must be consistent with the statute under which they are promulgated." *United States v. Larionoff*, 431 U.S. 864, 873 (1977). In addition, "[a] substantive rule is invalid if the agency has failed to comply with APA requirements." *Southern California Aerial Advertisers' Ass'n v. Fed. Aviation Admin.*, 881 F.2d 672, 677 (9th Cir. 1989); *see also Buschmann v. Schweiker*, 676 F.2d 352, 355-56 (9th Cir. 1982) ("A regulation is invalid if the agency fails to follow procedures required by the Administrative Procedures Act, 5 U.S.C. § 553."). Thus, a regulation may be substantively valid but fail because it is procedurally invalid.

Empire argues that the Secretary's 2005 Final Rule is both substantively and procedurally invalid. ECF No. 34 at 17-30. The Secretary contends that the 2005 Final Rule was properly adopted and that the Secretary's interpretation of the phrase "entitled to benefits under [Medicare] part A" is reasonable. *See* ECF No. 46 at 22-32. The Court first considers the substantive validity of 42 U.S.C. § 412.106(b)(2), then its procedural validity.

***I. Interpretation of the Phrase "Entitled to Benefits Under [Medicare] Part A"***

Empire challenges the Secretary's application of 42 C.F.R. § 412.106(b)(2), which is the Medicare fraction in the DPP provision, and contends that the agency's interpretation of 42 U.S.C. § 1395ww(d)(5)(F) is arbitrary and capricious. *See* ECF No. 1 at 14. Under the 2005 Final Rule, the patient-days of patients who exhausted their Medicare Part A coverage are included in the Medicare fraction. *See* 69 Fed. Reg. 49,098-99 (Aug. 11, 2004). Prior to the Secretary's promulgation of the 2005 Final Rule, exhausted Medicare Part A patient-days were not included in the Medicare fraction, and when a patient was eligible for Medicaid, exhausted Medicare Part A patient-days were included in the Medicaid fraction. *See id.* The Secretary argues that it correctly and reasonably interpreted § 1395ww(d)(5)(F) in the 2005 Final Rule amending 42 C.F.R. § 412.106(b)(2), and in the agency's subsequent application of the regulation. *See* ECF No. 46 at 2.

The standard of review for an agency's interpretation of a statute that is reflected in a regulation adopted through notice-and-comment rulemaking is the two-step framework outlined in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984). *See United States v. Mead Corp.,* 533 U.S. 218, 226-27 (2001) (requiring analysis under the Chevron framework for regulations adopted through notice-and-comment rulemaking). The first question for the reviewing court is "whether Congress has directly spoken to the precise

question at issue." *Chevron,* 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. The reviewing court employs "traditional tools of statutory construction" to ascertain whether "Congress had an intention on the precise question." *Id.* at 843 n.9. The precise substantive question before the Court is whether Congress intended the phrase "entitled to benefits under [Medicare] Part A" in the Medicare fraction of the DPP provision to mean "qualified to receive benefits" or "legally due payment."

The Supreme Court has held that "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. In this second step of *Chevron*, the court "must reject administrative constructions of [a] statute . . . that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *Fed. Election Comm'n v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 32 (1981). The agency's construction need not be the only possible permissible interpretation of the statute, nor must it be "even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron,* 467 U.S. at 843 n.11. Rather, the agency's construction need only be a "permissible" construction of the statute. *Id.* at 843.

### A. *Stare Decisis for* Chevron *Decisions*

"A court's prior judicial construction of a statute overrides an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for discretion." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 983 (2005). In other words, the doctrine of stare decisis applies if a prior court has reached a *Chevron* Step One decision finding that "Congress has directly spoken to the precise question at issue." *See Chevron*, 467 U.S. at 842.

Empire argues that in *Legacy Emanuel Hospital and Health Center v. Shalala*, 97 F.3d 1261, 1265 (9th Cir. 1996), the Ninth Circuit Court of Appeals reached a *Chevron* Step One decision regarding the interpretation of "entitled" in the DPP provision, and that interpretation is binding on this Court. *See* ECF No. 34 at 21-22. The Secretary contends that the *Legacy* court's *Chevron* Step One determination is "limited to the precise question at issue" in *Legacy*, which was the interpretation of the word "eligible" in the Medicaid fraction. *See* ECF No. 46 at 25-27 (citing *Legacy Emanuel*, 97 F.3d at 1265-66). The Secretary argues that the *Legacy* court did not answer the precise question presently before this Court regarding the interpretation of the phrase "entitled to benefits under [Medicare] part A" in the Medicare fraction of the DPP provision. *Id.* The Secretary argues

that the *Legacy* decision is not binding on this Court, and that the Court should proceed with a full *Chevron* analysis. *Id.*

The Court first considers whether the Ninth Circuit's statements in *Legacy* constitute a *Chevron* Step One holding regarding the statutory meaning of "entitled" in the context of the Medicare fraction when the *Legacy* court's statements related to the statutory meaning of "entitled" in the context of the Medicaid fraction. If so, then the *Legacy* holding would be binding on this Court under the doctrine of stare decisis.

In *Legacy*, the Ninth Circuit Court of Appeals considered the validity of the Secretary's interpretation of the word "eligible" in the Medicaid fraction of the DPP provision. *See Legacy Emanuel*, 97 F.3d at 1261-62. The *Legacy* court held that "the language of the Medicare reimbursement provision is clear: the Medicaid proxy includes all patient days for which a person was eligible for Medicaid benefits, whether or not Medicaid actually paid for those days of service." *Id.* at 1265. The court based its conclusion on "Congress's use of the word 'eligible' rather than 'entitled,' as well as Congress's use of the Medicaid proxy to define non-Medicare low-income patients for purposes of determining a hospital's share of low-income patients." *Id.* The words "eligible" and "entitled" both appear in the Medicaid fraction.

In reaching its conclusion, the *Legacy* court cited and discussed *Jewish Hospital, Inc. v. Secretary of Health and Human Services*, a Sixth Circuit Court of Appeals decision that considered the same question regarding the interpretation of "eligible" in the Medicaid fraction. *See Legacy Emanuel*, 97 F.3d at 1264-65 (citing *Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270 (6th Cir. 1994)). In *Jewish Hospital*, the Secretary argued that Congress intended "eligible" in the Medicaid fraction to include "only those days actually paid by Medicaid." *Jewish Hosp.*, 19 F.3d at 272. The Sixth Circuit concluded that, "by using the different terms 'entitled' and 'eligible' in adjacent provisions, Congress intended different meanings for the terms." *Legacy Emanuel*, 97 F.3d at 1264 (citing *Jewish Hosp.*, 19 F.3d at 275). Although the court found Congress's intent clear, it continued its analysis. *See Jewish Hosp.*, 19 F.3d at 275. The Sixth Circuit went on to hold that, "even if the language of the statute can be deemed silent or ambiguous, the Secretary's construction is *not* permissible" because "[t]he legislative history of the Medicaid proxy clearly shows that the Secretary's construction is contrary to that intent expressed by Congress." *Id.* at 275-76 (emphasis in original). The *Jewish Hospital* court held that according to the plain language of the DSH adjustment statute, "the word 'eligible' refers to whether a patient is capable of receiving . . . Medicaid." *Id.* at 274.

In 2013, after the Secretary issued the 2005 Final Rule amending the agency's policy regarding the interpretation of "entitled to benefits under [Medicare] part A" in the Medicare fraction, the parties in *Metropolitan Hospital v. United States HHS*, 712 F.3d 248 (6th Cir. 2013), challenged whether the patient-days of individuals "entitled to benefits under [Medicare] part A" in the Medicare fraction include "the patient days of all Medicare [Part A] beneficiaries, regardless of whether a beneficiary has exhausted coverage for any particular patient day." *Id.* at 253. In the case presently before the Court, Empire similarly challenges whether the statutory interpretation of "entitled to benefits under [Medicare] part A" in the 2005 Final Rule applies to patient-days for which no payment was received under Medicare Part A. *See* ECF No. 1 at 1, 14.

After opining that "courts often describe statutory language as 'clear' or 'unambiguous' without making a *Chevron* step-one holding," the *Metropolitan Hospital* court determined that the *Jewish Hospital* decision was "unclear regarding whether the court's *Chevron* step-one discussion is a holding," because "the only explicit statements of a holding that appear in *Jewish Hospital* are expressed in terms of *Chevron* step two." *Metro. Hosp.*, 712 F.3d at 256. The *Metropolitan Hospital* court stated that the *Jewish Hospital* opinion "proceeds in the *Chevron* analysis to conclude that the Secretary's interpretation was

impermissible," a holding in line with *Chevron* step two. *Id.* at 256 (citing *Jewish Hosp.*, 19 F.3d at 275-76).

The *Metropolitan Hospital* court stated that, even if it read the *Jewish Hospital* decision as a *Chevron* Step One holding, the *Metropolitan Hospital* court "decline[d] to hold that *Jewish Hospital*'s 'back-up' analysis contrasting the phrase 'entitled to benefits under [Medicare] part A' with the phrase 'eligible for [Medicaid]'" resolved the "precise question at issue" in *Metropolitan Hospital*, which was the interpretation of "entitled to benefits under [Medicare] part A" in the Medicare fraction. *Id.* at 257. Therefore, the court in *Metropolitan Hospital* concluded it was not bound by the *Jewish Hospital* decision, and proceeded with a full *Chevron* analysis of the statutory interpretation of the phrase "entitled to benefits under [Medicare] part A." *Id.* at 255-66.

In this case, Empire argues that the *Legacy* court's conclusion is controlling as a *Chevron* Step One decision that "the statutory language is clear because of Congress's use of 'eligible' rather than 'entitled,' and because Congress's overarching goal was to reimburse hospitals for the added expense of serving low-income patients." ECF No. 34 at 22 (citing *Legacy*, 97 F.3d at 1266). Empire argues that, when the *Legacy* court distinguished "eligible" and "entitled" in the Medicaid fraction, the *Legacy* court found that Congress's intent was clear and unambiguous and that Congress intended "entitled" to mean "entitled to payment,"

foreclosing this Court's need to repeat a *Chevron* Step One analysis of the interpretation of the phrase "entitled to benefits under [Medicare] part A" in the Medicare fraction of the DPP provision. *Id.* (citing *Legacy*, 97 F.3d at 1266).

The Secretary contends that *Legacy*'s *Chevron* Step One holding is not controlling in this case. ECF No. 46 at 26. The Secretary argues that the opinion in *Legacy* only applies narrowly to the specific issue in that case, namely the meaning of "eligible" as it pertained to Medicaid patient-days in the Medicaid fraction, and not to the meaning of the language in the Medicare fraction at issue in this case. ECF No. 46 at 26.

Courts considering the statutory interpretation of the Medicaid and Medicare fractions have concluded that the two fractions are separate and distinct. The *Metropolitan Hospital* court concluded that it is "clear from the statute" that "these two fractions are exclusive of one another." *Metro. Hosp.*, 712 F.3d at 262-63. Nevertheless, they are interrelated. A Medicare Part A patient-day may not be counted as a Medicaid patient-day, because the DPP provision excludes the patient-days of patients who are entitled to Medicare Part A benefits from the Medicaid fraction. *See id.* (citing 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)).

The *Legacy* court concluded that the clauses "entitled to benefits under [Medicare] part A" and "eligible for medical assistance under [Medicaid]" "serve different purposes" in the Medicare and Medicaid fractions respectively. *Legacy*

*Emanuel*, 97 F.3d at 1266.  Within the Medicare fraction, "the language 'entitled to benefits under [Medicare]' does not serve to define Medicare patients that are low-income."  *Id.*  The low-income status of patients in the Medicare fraction is determined by their entitlement to SSI.  *Id.*  "Within the Medicaid proxy, in contrast, the language 'eligible for medical assistance under [Medicaid]' defines the low-income status of patients."  *Id.*

Departing from the Sixth Circuit's ambiguous *Chevron* Step Two conclusion in *Jewish Hospital*, the Ninth Circuit Court in *Legacy* reached a *Chevron* Step One decision regarding Congress's clear intent regarding the meaning of "eligible" in the Medicaid fraction.  *See Legacy Emanuel*, 97 F.3d at 1265.  The *Legacy* court held that the congressional intent regarding the use of "eligible" in the Medicaid fraction was clear, rather than reaching a holding regarding the interpretation of "entitled" in the Medicare fraction.  *See id.*  That decision is controlling in this circuit regarding the Medicaid fraction, but the *Legacy* court did not resolve "the precise question at issue" in the matter before this Court regarding the interpretation of the phrase "entitled to benefits under [Medicare] part A."  *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi).  Accordingly, this Court undertakes a *Chevron* analysis in the specific context of the Medicare fraction within the DPP provision.

/ / /

/ / /

### B. Chevron Step One Analysis

Employing the traditional tools of statutory construction, the Court first considers "whether Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842-43, 843 n.9. Courts may presume that "Congress legislates with knowledge of [the court's] basic rules of statutory construction." *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991). Traditional tools of judicial statutory construction include considering the plain meaning of the language in the statute, dictionary definitions, canons of construction, legislative purpose, and legislative history. *See, e.g.*, *Legacy Emanuel*, 97 F.3d at 1265.

Empire argues that the Secretary's interpretation of "entitled to benefits under [Medicare] part A" in the 2005 Final Rule's amendment of the DPP provision fails *Chevron* Step One because it is contrary to the plain language of the statute and is applied inconsistently within the statute. *See* ECF No. 34 at 20-23. The Secretary contends that 42 U.S.C. § 426 provides a clear meaning for the phrase "entitled to benefits under Medicare Part A" in the Medicare fraction. ECF No. 46 at 23. Additionally, the Secretary argues that if the Court finds the meaning of the word "entitled" in the Medicare fraction ambiguous, the Court should uphold the agency's interpretation of the statute as permissible under a *Chevron* Step Two analysis. ECF No. 46 at 5, 27.

Clarifying the meaning of "entitled" matters because an individual may satisfy the conditions for Medicare eligibility, but may not receive Medicare Part A benefits because Medicare Part A provides a limited benefit to hospitalized patients: beneficiaries are covered only for the first 90 days of any given hospitalization. 42 C.F.R. § 409.61(a)(1). Each Medicare Part A beneficiary also "has a non-renewable lifetime reserve" of 60 additional days of coverage which, until they are exhausted, can be used to cover periods of hospitalization lasting longer than 90 days. *Id.* § 409.61(a)(2).

By statute, Medicare generally pays after other sources of insurance, such as a worker's compensation plan. 42 U.S.C. § 1395y(b). Individuals may receive both Medicare Part A and Medicaid benefits. These individuals are "dual-eligible." *See Metro. Hosp.*, 712 F.3d at 252. Two scenarios exist in which a person may qualify for Medicare Part A and yet not receive or be "covered" by his or her Medicare Part A benefits. First, an individual may have other sources of insurance that must be exhausted before an individual receives Medicare Part A benefits. 42 U.S.C. § 1395y(b)(2) (describing the "Medicare Secondary Payer" system). Second, an individual may exhaust her Medicare Part A coverage by using all of the hospital care patient-days provided for under Medicare. *Id.* § 1395d(b)(1). In the first case, Medicare Part A benefits only begin when the individual's other coverage is exhausted. *Id.* § 1395y(b)(2). In the second case,

Medicare no longer pays for the patient's hospital services. In either scenario, individuals who are qualified for Medicare Part A benefits do not receive those benefits because they have either not exhausted their other coverage or they have exhausted their Medicare Part A coverage.

Under the Secretary's current policy, the Secretary counts all the patient-days of individuals qualified for Medicare Part A in the Medicare fraction of the DPP provision, regardless of whether they are receiving coverage for their hospital patient-days under Medicare Part A.

### 1. Plain Language

"In construing the provisions of a statute, we first look to the language of the statute to determine whether it has a plain meaning." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009). Where the statutory language is plain and "admits of no more than one meaning," the duty of interpretation does not arise. *Caminetti v. United States*, 242 U.S. 470, 485 (1917). "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). However, the canon that courts "construe a statutory term in accordance with its ordinary or natural meaning" applies only "in the absence of [a statutory] definition." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994).

### i. No Statutory Definition Exists in 42 U.S.C. § 1395ww

No definition of the phrase "entitled to benefits under [Medicare] Part A" is provided in the DPP provision or elsewhere in the statutory section in which the DPP formula appears. *See* 42 U.S.C. § 1395ww; *see also Metro. Hosp.*, 712 F.3d at 256. However, the Secretary argues that 42 U.S.C. § 426(a) provides a statutory definition of the phrase "entitled to benefits under [Medicare] Part A." *See* ECF No. 46 at 23. Subsection 426(a) provides that "every individual who . . . has attained age 65, and . . . is entitled to monthly [Social Security benefits] . . . shall be entitled to hospital insurance benefits under [Medicare Part A] for each month for which he meets the [above specified conditions]." The Secretary contends that, in the language of 42 U.S.C. § 426(a), "Congress has defined [']entitled to part A['] and foreclosed [Empire's] interpretation that ['entitled'] turns on whether a particular patient day is covered." ECF No. 46 at 23.

The Court disagrees. Subsection 426(c), titled "Conditions," states that "[f]or the purposes of subsection (a) . . . entitlement of an individual to hospital benefits for a month shall consist of entitlement to have payment made under, and subject to the limitations in, [Medicare Part A] on his behalf for inpatient hospital services . . . during such month." Furthermore, § 426 does not reference the DPP provision, so it is unclear whether Congress actually contemplated defining "entitled to benefits under [Medicare] part A" through § 426. The Court finds that

the definition provided in subsection 426(a) is not dispositive with regards to the meaning of "entitled to benefits under [Medicare] part A" in the DPP provision within 42 U.S.C. § 1395ww. Therefore, the Court will consider the ordinary meaning of the word "entitled."

### ii. Ordinary Meaning of "Entitled"

"Entitle" is defined in Black's Law Dictionary as "to grant a legal right to" and "to qualify for." *Entitle*, Black's Law Dictionary (10th ed. 2014). Empire argues that, in the context of 42 U.S.C. § 1395ww, "entitled to benefits under [Medicare] Part A" means "granted a legal right to" actual payment of benefits under Medicare Part A. ECF No. 34 at 21. Conversely, the Secretary contends that the phrase "entitled to benefits under [Medicare] Part A" is properly interpreted as meaning "qualified for" benefits under Medicare Part A, regardless of whether payment is made. *See* ECF No. 46 at 23.

It appears to the Court that "entitle" has two plainly conflicting meanings. The Court thus finds that the plain meaning of "entitled" in this context does not demonstrate Congress's clear and unambiguous intent as required by *Chevron* Step One. *See Chevron*, 467 U.S. at 842-43. Therefore, the Court considers another canon of construction: whether Congress's intended meaning of "entitled to benefits under [Medicare] part A" may be inferred from other uses of the word

"entitled" or the phrase "entitled to benefits under [Medicare] part A" within 42 U.S.C. § 1395ww.

### iii. Consistent Use

Another rule of statutory construction is that "identical words used in different parts of the same act are intended to have the same meaning." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995). Conversely, the use of different language by Congress creates a presumption that Congress intended the terms to have different meanings. *See Washington Hosp. Center v. Bowen,* 795 F.2d 139, 146 (D.C. Cir. 1986).

The phrase "entitled to benefits under [Medicare] part A" appears seven times throughout 42 U.S.C. § 1395ww other than in the DPP provision, and three times within the DPP provision. *See* 42 U.S.C. § 1395ww. "Moreover, the phrase 'entitled to benefits under [Medicare] part A' appears in more than 30 other sections of the Medicare statute, indicating that the phrase has a specific, consistent meaning throughout the statutory scheme, rather than a varying, context-specific meaning in each section and subsection." *Metro. Hosp.*, 712 F.3d at 260. In the Medicare statute, several references to the phrase expressly recognize the difference between a patient who has exhausted his or her Medicare Part A coverage for a particular spell of illness and a patient who is not entitled to Medicare benefits at all. *Id.* For example, 42 U.S.C. § 1395l(t)(1)(B)(ii) provides

coverage for certain outpatient-department services that are "furnished to a hospital inpatient who (I) is entitled to benefits under [Medicare] part A . . . but has exhausted benefits for inpatient services during a spell of illness, or (II) is not so entitled." The Court finds Congress's frequent use of the phrase "entitled to benefits under [Medicare] part A" and the logic of the *Metropolitan Hospital* decision persuasive but not dispositive.

In contrast, Empire argues that when Congress used the word "entitled" for Medicare Part A benefits and SSI benefits in the Medicare fraction, Congress intended the word to be applied consistently. ECF No. 34 at 23-24. Empire asserts that the Secretary interprets the word "entitled" differently within the same sentence of the statute, in conflict with Congress's intention and the canon of statutory construction that "identical words used in different parts of the same statute are generally presumed to have the same meaning." *Id.* (quoting *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005)). The Court agrees that the Secretary treats "entitled" for the purposes of Medicare Part A as "qualified for," and "entitled" for the purposes of SSI benefits as "granted a legal right to" actually payment. *See* 69 Fed. Reg. 49,098-99 (Aug. 11, 2004). The Secretary's inconsistent interpretation of "entitled" conflicts with the canon of construction holding that the same word used within a statute generally has the same meaning.

1    Taking both of these arguments into consideration, the Court concludes that

2    Congress's intent regarding the interpretation of the phrase "entitled to benefits

3    under [Medicare] part A" in the DPP provision is not clearly evinced by the

4    repeated uses of the word "entitled" or the phrase "entitled to benefits under

5    [Medicare] part A."  Based on the absence of a statutory definition, the lack of

6    clear ordinary meaning, and the Congress's repeated but unclear uses of the word

7    "entitled" and phrase "entitled to benefits under [Medicare] part A," the Court

8    finds that Congress's intent is unclear as to the meaning of "entitled to benefits

9    under [Medicare] part A" in the DPP provision.  Therefore, the Court next looks to

10   the statutory purpose to determine whether Congress provided a clear and

11   unambiguous intent for the meaning of the phrase "entitled to benefits under

12   [Medicare] part A" in its expression of the purpose of the DSH provision.  *See*

13   *Chevron*, 467 U.S. at 842-43.

14       ***2. Statutory Purpose***

15       If the statutory text is unclear, courts may look to the purpose of the statute

16   to determine whether Congress clearly and unambiguously expressed its intent

17   there.  *See Chevron*, 467 U.S. at 843 n.9 ("If a court, employing traditional tools of

18   statutory construction, ascertains that Congress had an intention on the precise

19   question at issue, that intention is the law and must be given effect.").  "In

20   ascertaining the plain meaning of the statute, the court must look to the particular

21

statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier*, 486 U.S. 281 (1988). "[T]he function of the courts" in cases of statutory interpretation "is to construe the language so as to give effect to the intent of Congress." *United States v. American Trucking Ass'ns*, 310 U.S. 534, 542 (1940).

"Congress's 'overarching intent' in passing the [DSH] provision was to supplement the [PPS] payments of hospitals serving 'low income' persons." *Legacy Emanuel*, 97 F.3d at 1265. "Congress intended the Medicare and Medicaid fractions to serve as a proxy for all low-income patients." *Id.* In the Medicare fraction, the low-income status of Medicare patients receiving hospital care "is determined by their entitlement to SSI." *Id.* at 1256-66. In the Medicaid fraction, the number of Medicaid-eligible patient-days accounts for the low-income patients eligible to receive Medicaid and receiving hospital care. *Id.* at 1266. However, "knowing the statute's general purpose and that the two DPP fractions are mutually exclusive is insufficient to divine a clear congressional intent regarding whether a Medicare patient who has exhausted his or her days of inpatient services for a particular spell of illness is 'entitled to benefits under [Medicare] part A.'" *Metro. Hosp. v. United States HHS*, 712 F.3d 248, 263 (6th Cir. 2013).

Neither party's interpretation of "entitled" includes in the DPP calculation all groups of low-income patients.[1]  *See id.*  "Because either interpretation would necessarily exclude certain low-income patients from the DPP calculation," the Sixth Circuit in *Metropolitan Hospital* found "no support for a clear statutory mandate to account for *all* low-income patients between the two fractions."  *Id.*  Likewise, this Court finds no clear intent regarding the meaning of "entitled to benefits under [Medicare] part A" in the statutory purpose of 42 U.S.C. § 1395ww.

Neither the plain language of 42 U.S.C. § 1395ww nor the statutory purpose demonstrates a clear and unambiguous Congressional intent for the meaning of the

---

[1] Under the Secretary's present interpretation of "entitled to benefits under [Medicare] part A," all patient-days of patients who satisfy the conditions for Medicare eligibility and who are receiving SSI payments are counted in the Medicare fraction.  *See Metro. Hosp.*, 712 F.3d at 263.  All patients who satisfy the conditions for Medicare eligibility are excluded from the Medicaid fraction.  42 C.F.R. § 412.106(b)(4).  The Secretary's application of the DPP provision thus excludes patients who are "entitled" to Medicare and enrolled in SSI but are not receiving SSI payments, despite the fact that these patients are, by virtue of their enrollment in SSI, low income.  *See Metro. Hosp.*, 712 F.3d at 263.

Under the Secretary's previous policy, which Empire advocates in this case, "any Medicare patient who has exhausted his or her days of inpatient hospital services for a particular spell of illness is no longer 'entitled to benefits under [Medicare] part A.'"  *See id.*  The patient's Medicare Part A exhausted days cannot be counted in the Medicare fraction, but these exhausted days may only be counted in the Medicaid fraction if the patient is Medicaid-eligible.  *See* 42 C.F.R. § 412.106(b)(4).  Therefore, this interpretation excludes patients who are enrolled in SSI and eligible for Medicare, but not eligible for Medicaid, despite the fact that these patients are also low income.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 28

phrase "entitled to benefits under [Medicare] part A" in the DPP provision. *See Chevron*, 467 U.S. at 842-43. Therefore, the Court concludes its *Chevron* Step One analysis and considers whether the Secretary's interpretation is permissible under *Chevron* Step Two.

### C. Chevron Step Two Analysis

"[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. "[U]nder *Chevron* step two, we ask whether an agency interpretation is 'arbitrary or capricious in substance,'" *Judulang v. Holder*, 565 U.S. 42, 52 n.7 (2011), or "manifestly contrary to the statute." *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 53 (2011). "A court lacks authority to undermine the regime established by the Secretary unless her regulation is 'arbitrary, capricious, or manifestly contrary to the statute.'" *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 826 (2013). Furthermore, "[a] court must uphold the Secretary's judgment as long as it is a permissible construction of the statute, even if it differs from how the court would have interpreted the statute in the absence of an agency regulation." *Id.*

Under *Chevron* Step Two, courts generally give agency statutory interpretations substantial deference "when it appears that Congress delegated

authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead Corp.*, 533 U.S. at 226-27. An agency's interpretation of statutory authority is examined "in light of the statute's text, structure, and purpose." *Miguel-Miguel v. Gonzales*, 500 F.3d 941, 949 (9th Cir. 2007). The interpretation fails if it is "unmoored from the purposes and concerns" of the underlying statutory framework. *Judulang*, 565 U.S. at 64.

In the regulation implementing the DPP provision, the Secretary uses "entitled" only once in the numerator of the Medicare fraction, departing from the statutory language of 42 U.S.C. § 1395ww. *See* 42 C.F.R. § 412.106(b) (assessing patient-days of patients who were "entitled to both Medicare Part A (including Medicare Advantage (Part C)) and SSI"). The Secretary interprets this single use of "entitled" in different ways for counting patient-days of patients "entitled" to Medicare Part A and counting patient-days of patients "entitled" to SSI. The Secretary counts patient-days for which individuals are "entitled to [SSI benefits]" as only those days on which individuals actually receive payment of SSI benefits. In contrast, under the 2005 Final Rule, the Secretary counts patient-days for which individuals are "entitled to benefits under [Medicare] Part A" as all patient-days on which an individual qualifies for Medicare Part A, whether or not the individual actually receives Medicare Part A benefits on that day. This inconsistent

application of the word "entitled" does not appear entirely reasonable; however, nothing in the language of 42 U.S.C. § 1395ww precludes the Secretary's interpretations in relation to Medicare Part A and SSI benefits. *See Metro. Hosp.*, 712 F.3d at 265-66. Therefore, the Secretary's interpretation is not "manifestly contrary to the statute." *Chevron*, 467 U.S. at 843.

The Court next considers whether the Secretary has considered the "purposes and concerns" of the underlying statutory framework. *See Judulang*, 565 U.S. at 64. The Secretary provided the agency's reasons for reaching its interpretation of the phrase "entitled to benefits under [Medicare] part A" when the Secretary published the 2005 Final Rule. *See* 69 Fed. Reg. 49,098-99 (Aug. 11, 2004). The Secretary stated that the agency "proposed this change to facilitate consistent handling of [Medicare Part A] days across all hospitals." *Id.* at 49,098. The Secretary considered and responded to the comments that had been submitted before adopting a policy to include the patient-days associated with dual-eligible beneficiaries in the Medicare fraction, whether or not the beneficiary has exhausted Medicare Part A hospital coverage. *Id.* at 49,098-99. Based upon the Secretary's rationale in the 2005 Final Rule, the Court concludes that the Secretary's decision to count all the patient-days of individuals qualified for Medicare Part A, regardless of whether they are receiving coverage under Medicare Part A, must be given controlling weight. *See Chevron*, 467 U.S. at 843.

The Court finds that Congress provided no express guidance regarding how Medicare Part A patient-days should be counted for the purposes of assessing the DPP in assessing the DSH adjustment. Therefore, the Court finds permissible the Secretary's interpretation of "entitled to benefits under [Medicare] part A" in § 1395ww, and, under *Chevron*, the Court defers to the Secretary's construction. *See Chevron*, 467 U.S. at 843. Although it finds that 42 C.F.R. § 412.106(b)(2) is substantively valid based upon the Secretary's statutory interpretation, the Court also must analyze whether 42 C.F.R. § 412.106(b)(2) is procedurally valid.

## II. Procedural Validity of 42 C.F.R. § 412.106(b)(2)

Empire argues that the Secretary did not follow proper notice-and-comment procedures in the implementation of the 2005 Final Rule because the Secretary misstated his then-existing policy in the 2003 Notice of Proposed Rulemaking, invalidating the 2005 Final Rule. ECF No. 34 at 19-20. The Secretary contends that the 2005 Final Rule was properly adopted despite the Secretary's misstatement of the agency's policy in the 2003 Notice of Proposed Rulemaking; the Rule is a logical outgrowth of the proposed rule; and the Rule is, therefore, procedurally valid. *See* ECF No. 46 at 27-30.

### A. Rulemaking Process Leading to the 2005 Final Rule

The rulemaking process leading to the promulgation of the 2005 Final Rule occurred over a two-year period. In both May 2003 and May 2004, the Secretary

published a notice of proposed rulemaking in anticipation of promulgating a final

rule for the upcoming federal fiscal year. Between May and July each year, an

approximately two-month-long open comment period followed each notice of

proposed rulemaking, one in 2003 and one in 2004. In August 2003 and August

2004, the Secretary promulgated final rules for the upcoming federal fiscal year,

the 2004 Final Rule and the 2005 Final Rule, respectively.

The Secretary did not adopt the 2003 proposal in the 2004 Final Rule and

stated that the Secretary would address the comments regarding the agency's

proposal in a later document. Likewise, the 2004 notice of proposed rulemaking

merely stated that the Secretary would address the comments that the agency had

received in a forthcoming rule. *See* 69 Fed. Reg. 28,286 (May 18, 2004). The first

time that the Secretary addressed the comments submitted regarding the 2003

notice of proposed rulemaking was in the promulgation of the 2005 Final Rule.

*See infra* Part II.A.6.

A recent district court case decided in the D.C. Circuit, *Stringfellow*

*Memorial Hospital v. Azar*, provides a thorough history of the rulemaking process

for the 2005 Final Rule as it relates to the Secretary's amendment of his policy

regarding the application of "entitled to benefits under [Medicare] part A" in the

Medicare fraction of the DPP provision. *See Stringfellow Mem'l Hosp. v. Azar*,

Civil Action No. 17-309 (D.D.C. June 29, 2018). The Court recommends reading

*Stringfellow* for a detailed description of the Secretary's rulemaking process, which the Court will repeat here only in relevant part.

### 1. 2003 Notice of Proposed Rulemaking

In May 2003, the Secretary issued a notice of proposed rulemaking for the 2004 fiscal year that proposed a change in how he treated individuals not receiving Medicare Part A benefits for purposes of the DPP calculation and DSH adjustment. *See* 68 Fed. Reg. 27,154 (May 19, 2003). The Secretary inaccurately stated that the agency's then-existing policy counted all dual-eligible patient-days in the Medicare fraction, excluding them from the Medicaid fraction, even if the patient was not receiving Medicare Part A benefits. *See id.* at 27,207-08. The Secretary proposed to change this policy for counting the patient-days of Medicare Part A beneficiaries whose Medicare Part A coverage had been exhausted. He proposed to count exhausted Medicare Part A patient-days in the Medicaid fraction of the DPP provision. *See id.* at 27,208-09.

### 2. Initial 2003 Comment Period for 2003 Proposed Rule

An initial open comment period followed the 2003 notice of proposed rulemaking, with a July 18, 2003 deadline for the submission of comments. 68 Fed. Reg. 27,154 (May 19, 2003).

Many commenters supported the policy that the Secretary had described as the then-existing policy: the inclusion of dual-eligible patient-days in the Medicare

fraction of the DPP provision, regardless of whether the patient's Medicare Part A coverage had been exhausted. *See, e.g.*, AR at 486R; 583R; 718R; 816R. These commenters indicated that they opposed the proposed change to begin including dual-eligible exhausted patient-days in the numerator of the Medicaid fraction.

For example, the American Hospital Association ("AHA") opposed the proposed change because the [Centers for Medicare and Medicaid Services ("CMS")] provided "no justified reason for making this change, and there are clear reasons not to make this change." Administrative Record ("AR") at 754R. The AHA noted that "the proposed change would place a significant new regulatory and administrative burden on hospitals," and that "CMS clearly states in the proposed rule that the current formula is consistent with statutory intent." *Id.* In addition, the AHA explained that "it is likely that this proposed change would result in reduced DSH payments to hospitals," because "[a]ny transfer of a particular patient day from the Medicare fraction (based on total Medicare patient days) to the Medicaid fraction (based on total patient days) will dilute the value of that day, and therefore reduce the overall patient percentage and the resulting DSH adjustment." *Id.* at 754–55R. The AHA stated that "the calculation of dual-eligible days must not be changed." *Id.* at 755R.

A number of commenters echoed the AHA, opposing the proposed change on the grounds that the change would result in large administrative burdens for

hospitals. *See, e.g., id.* at 486R (comments of Association of American Medical Colleges that the "current policy is consistent with statutory intent" and that the proposed policy will impose a "new administrative burden . . . on hospitals to provide documentation"); *id.* at 583R (comments of Healthcare Association of New York State that "it will be difficult for hospitals to provide the data required under this proposal").

Two commenters supported the proposed policy change. *See id.* at 566R (comments in support from BlueCross BlueShield); *id.* at 860R (comments in support from the law firm Vinson & Elkins). In addition to supporting the Secretary's proposed policy, Vinson & Elkins also expressed confusion about the Secretary's statement of the then-existing policy. *See id.* at 860R. Vinson & Elkins "disagree[d] . . . that CMS' description of its past practice is correct." *Id.* Specifically, Vinson & Elkins noted that the proposed rule was "at odds with the plain language of the regulation" governing the DSH adjustment, which stated that the Medicare fraction included "'covered patient days' only"—in other words, unexhausted days only. *Id.* at 861R (quoting 42 C.F.R. § 412.106(b)(2)(i) before its amendment). That is, the Secretary's stated proposed rule was actually the manner in which dual-eligible exhausted days were currently being handled and the exact opposite of the policy the Secretary had put forth as the then-existing policy. Vinson & Elkins urged CMS to correct its misstatement, arguing that if the

agency chose to stand by those statements, "it will squander its credibility with the courts and set[ ] itself up not only to lose as the issue is litigated but to subject itself to paying attorney fees and other sanctions." *Id.*

Southwest Consulting Associates ("SCA") also wrote to identify the misstatement, noting that "CMS' statement 'the days of patients who have exhausted their Medicare Part A coverage will no longer be included in the Medicare fraction' is inconsistent with CMS' current actual practice with respect to the Medicare fraction." *Id.* at 405R. SCA had obtained a letter from the U.S. Department of Health and Human Service's Office of General Counsel, dated August 14, 2001, "stating that only covered days [that is, unexhausted days] are used in the [Medicare] fraction." *Id.*; *see also id.* at 363R (letter from Linda Banks, CMS, to Christopher Keough, noting that "the Medicare/SSI denominator includes only the covered days," not exhausted days). Thus, SCA noted that "[t]o say that [exhausted] days 'will no longer be included'" in the Medicare fraction "may be a change in 'policy,' but it is clearly not a change in 'practice.' That begs the question—What was the 'policy'—what CMS professed or what it did?" *Id.* at 405R.

### 3. 2004 Final Rule

On August 1, 2003, the Secretary issued a final rule for the 2004 fiscal year. Regarding the treatment of dual-eligible patient-days, the Secretary noted that

"[w]e are still reviewing the large number of comments received on the proposed provision relating to dual-eligible patient days in the May 19, 2003 [sic]. Due to the number and nature of the comments we received on our proposed policies, we are addressing the public comments in a separate document." 68 Fed. Reg. 45,346, 45,421 (Aug. 1, 2003). The 2004 Final Rule did not acknowledge or address the commenters' concerns that the agency may have misstated its then-existing policy by confusing its current practice with its proposed practice. No other document or notice followed between August 1, 2003, and May 2004.

### 4. 2004 Notice of Proposed Rulemaking

In May 2004, the Secretary issued a notice of proposed rulemaking for the 2005 fiscal year for general changes to the Medicare system. The 2004 notice of proposed rulemaking stated that the comments relating to dual-eligible patient-days would be addressed in a forthcoming final rule. 69 Fed. Reg. 28,286 (May 18, 2004). The Secretary explained that "[d]ue to the number and nature of the public comments received, we did not respond to the public comments on these proposals in the [2004 Final Rule]." *Id.* The Secretary did not mention any possible misstatement of his policy for handling dual-eligible days or any confusion regarding the agency's current policy and its proposed policy.

/ / /

/ / /

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 38

*5. 2004 Comment Period for 2004 Notice of Proposed Rulemaking and the Secretary's Clarification of the Agency's Policy*

An open comment period followed the publication of the 2004 notice of proposed rulemaking. This comment period closed on July 12, 2004. 69 Fed. Reg. 28,196 (May 18, 2004). During the 2004 comment period, many of the same commenters again wrote to the Secretary, opposing the proposed rule and supporting the policy that the Secretary had described as the then-existing policy.

Approximately three days[2] before the 2004 comment period closed, the Secretary issued a clarification via the CMS website regarding the agency's statement of its then-existing policy for counting exhausted patient-days for dual-eligible individuals. *See* AR at 340R; *see also* 69 Fed. Reg. 49,098 (Aug. 11, 2004) ("A notice to this effect was posted on CMS's website . . . on July 9, 2004."). In the CMS website clarification notice, the Secretary noted his

---

[2] During oral argument, both parties acknowledged that the Secretary published his statement four days before the end of the 2004 comment period. In its pleadings, Empire first states that the Secretary published the clarification of the agency's then-existing policy on July 9, 2004, ECF No. 34 at 19, but later states that the clarification was published on July 7, 2004. *See* ECF No. 48 at 12. The Federal Register indicates that the notice was published on the CMS website on July 9, 2004. 69 Fed. Reg. 49,098 (Aug. 11, 2004). The archived website page containing the notice indicates that it was last modified on July 7, 2004. AR at 340R. For the purposes of this Court's analysis, it makes no difference whether the Secretary cured his misstatement on July 7, 2004, or July 9, 2004, leaving between three and five days for interested parties to comment.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 39

misstatement of the agency's then-existing policy in the 2003 notice of proposed rulemaking, and concluded: "It has come to our attention, however, that [our previous statement of our policy] is not accurate. Our policy has been that only covered patient days are included in the Medicare fraction (42 C.F.R § 412.106(b)(2)(i))." AR at 340R.

Following the Secretary's clarification notice, numerous commenters submitted comments opposing the proposed rule. *See, e.g., id.* at 30–31R (comments of California Healthcare Association dated July 12, 2004, which do not mention the website notice, and restate the policy and proposal in line with the Secretary's inaccurate statements in the 2003 notice of proposed rulemaking); *id.* at 130R (comments of New Jersey Hospital Association dated July 12, 2004, restating the inaccurate policy articulated by the Secretary in the 2003 notice of proposed rulemaking and objecting to the proposed rule); *id.* at 152R (comments of Catholic Healthcare West dated July 9, 2004, laying out a similar argument). The reasons commenters provided for this opposition were substantially the same as those submitted in the 2003 comment period regarding concerns about the administrative burden and costs of implementing the proposed change. As support for their opposition, commenters also cited the Secretary's 2003 statement that the agency's then-existing policy was consistent with statutory intent. *See, e.g.*, *id.* at 130R (comments of New Jersey Hospital Association).

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 40

1    Several commenters mentioned the Secretary's website posting in their

2    comments.  *See, e.g.*, AR at 82R (comments of the Federation of American

3    Hospitals, stating that "CMS admitted in a July 7, 2004[,] bulletin that it had been

4    mistaken in its assertion that Part A Exhausted/Noncovered Days were in the

5    Medicare percentage").  The Federation of American Hospitals ("FAH"), which

6    had written in opposition to the proposed rule during the first comment period, AR

7    at 789R (submitted July 8, 2003), wrote to discuss the Secretary's misstatement.

8    *Id.* at 81-82R.  In its July 12, 2004, comment, FAH explained that, "[w]hen

9    drafting its comments for FY 2004, FAH took at face value CMS's statement that,

10   historically, Part A Exhausted/Noncovered Days have been included in the

11   Medicare fraction."  *Id.* at 81R.  "Assuming that this was true, and concerned that,

12   if moved to the Medicaid fraction, the burden would be on the provider to identify

13   these days, which might result in a lower number of days counted, FAH argued for

14   a continuation of the existing policy to include these days in the Medicare

15   percentage."  *Id.*  Since submitting its initial comments, however, "FAH ha[d] been

16   informed that at least one knowledgeable fiscal intermediary, and possibly

17   members of CMS staff, have indicated that further research has confirmed that

18   such days are, in fact, not currently (and never were) included in the Medicare

19   percentage."  *Id.* at 82R.  FAH thus urged the Secretary to "continue to accept

20   comments on this issue."  *Id.* at 81R.  In addition, FAH argued that dual-eligible

21

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT, AND DENYING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT ~ 41

exhausted days should be included in the Medicare fraction, but that "[i]f such days are not counted in the Medicare fraction, then the days must be counted in the Medicaid fraction." *Id.* at 82R.

The National Association of Public Hospitals and Health Systems ("NAPH") submitted its comment on July 8, 2004, stating, "we are deeply troubled by the recent web posting of a modification of these comments on the CMS website." *Id.* at 288R. The NAPH comment continued, "by posting [the notice] a few days before the FY 2005 IPPS proposed rule comments are due, CMS has limited the ability of the provider community to properly analyze and comment on this policy in the context of the proposed rule." *Id.* at 289R. NAPH expressed that it strongly opposed "a proposed change in the treatment of dual eligible patients who have exhausted their Medicare coverage for the purpose of counting patient days for the calculation of the Medicare DSH patient percentage." *Id.* at 286R.

### 6. 2005 Final Rule

In August 2004, the Secretary promulgated the 2005 Final Rule at issue in this case ("2005 Final Rule"). *See* 69 Fed. Red. 49,098 (Aug. 11, 2004). In the publication of the 2005 Final Rule, the Secretary acknowledged for the first time in the Federal Register that the agency had "misstated [its] current policy with regard to the treatment of certain inpatient days for dual-eligibles in the proposed rule of May 19, 2003," *id.* at 49,098, and noted that "[a] notice to this effect was posted on

CMS's Web site on July 9, 2004," *id.* (internal citation omitted).  The agency

clarified that, "[i]n that proposed rule, we indicated that a dual-beneficiary is

included in the Medicare fraction even after the patient's Medicare Part A hospital

coverage is exhausted. . . .  This statement was not accurate.  Our policy has been

that only covered patient days are included in the Medicare fraction." *Id.*

The Secretary responded to various comments and then adopted his final

rule, the policy he had stated in 2003 as the agency's then-existing policy and the

policy now at issue before this Court.  The Secretary noted that CMS had "received

numerous comments that commenters were disturbed and confused by our recent

Web site posting regarding our policy on dual-eligible patient days," and that many

commenters "believed that this posting was a modification or change in our current

policy" that required "formal notification by CMS" and an "opportunity for

providers to comment." *Id.*  The Secretary responded that the website notice "was

not a change in our current policy" and that, because the posting "was not a new

proposal or policy change," the Secretary did not need to "utilize the rule making

process in correcting a misstatement that was made in the May 19, 2003[,]

proposed rule regarding this policy." *Id.*

The 2005 Final Rule "adopt[ed] a policy to include the days associated with

dual-eligible beneficiaries in the Medicare fraction, whether or not the beneficiary

has exhausted Medicare Part A hospital coverage." *Id.* at 49,099.  In other words,

1 | the Secretary adopted the policy he had inaccurately described at the then-existing

2 | policy.  The amended regulation also considered patients who elect coverage under

3 | Part C of the Medicare Act, the "Medicare Advantage" program that provides

4 | benefits through a managed care plan, to be "entitled to benefits under Part A" for

5 | purposes of the Medicare fraction.  *See id.*  Ultimately, the 2005 Final Rule led to

6 | the amendment of 42 C.F.R. § 412.106(b)(2), which removed "covered" from the

7 | language of the regulation describing the assessment of Medicare Part A patient-

8 | days in the Medicare fraction.  Prior to the amendment of the rule, 42 C.F.R. §

9 | 412.106(b)(2) stated that the numerator of the Medicare fraction included "the

10 | number of *covered* patient days . . . furnished to patients who during that month

11 | were entitled to both Medicare Part A and SSI."  *See* ECF No. 34 at 12 (emphasis

12 | added).

13 | ### B. Compliance with APA Notice Requirements

14 | Empire disputes the validity of the Secretary's promulgation of the 2005

15 | Final Rule, which did not adopt the Secretary's proposed rule, but instead

16 | implemented the rule the Secretary had described inaccurately as the agency's

17 | then-existing policy.  *See* ECF No. 34 at 18.

18 | It is undisputed that the Secretary misstated the agency's then-existing

19 | policy in the 2003 Notice of Proposed Rulemaking and failed to correct the

20 | misstatement until approximately three days before the conclusion of the comment

21 |

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT, AND DENYING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT ~ 44

period preceding the promulgation of the 2005 Final Rule. Therefore, the Court considers whether the Secretary's notice regarding the treatment of Medicare Part A patient-days in the DPP provision failed to comply with the APA's notice requirements and was procedurally insufficient.

The APA generally requires a federal agency engaged in rulemaking to comply with notice-and-comment procedures. *See* 5 U.S.C. § 553(b). Specifically, a "notice of proposed rulemaking" must be "published in the Federal Register" and must notify the public of "the time, place, and nature of public rule making proceedings," "the legal authority under which the rule is proposed," and "the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* § 553(b)(1)-(3). "After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id.* § 553(c). The agency must publish notice of a proposed rule more than thirty days before its effective date. *Id.* § 553(d). Certain agency rulemaking is required by statute to be made on the record after opportunity for an agency hearing. *Id.* § 553(c). "A decision made without adequate notice and comment is arbitrary or an abuse of discretion." *NRDC v. United States EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002).

The object of the notice requirement is fair notice. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). Agencies "must provide notice sufficient to fairly apprise interested persons of the subjects and issues before the Agency." *NRDC*, 279 F.3d at 1186. Interested parties must have a meaningful opportunity to comment on the proposed regulation the agency contemplates. *See Safe Air for Everyone v. United States EPA*, 488 F.3d 1088, 1098 (2007).

Notice is generally considered adequate when interested parties reasonably could have anticipated the final rulemaking. *See NRDC*, 279 F.3d at 1186. In determining whether interested parties could reasonably have anticipated the final rule from the draft, "one of the salient questions is 'whether a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule.'" *Id.* (quoting *Am. Water Works Ass'n v. EPA*, 40 F.3d 1266, 1274 (D.C. Cir. 1994)). Another consideration is whether the changes in the final rule are "a logical outgrowth of the notice and comments received." *Rybachek v. United States EPA*, 904 F.2d 1276, 1288 (9th Cir. 1990).

To determine whether the agency has complied with the APA notice requirements, the court inquires whether "the notice fairly apprise[s] the interested persons of the subjects and issues before the Agency." *Louis v. U.S. Dep't of Labor*, 419 F.3d 970, 975 (9th Cir. 2005). A Federal Register notice of proposed

rulemaking must provide basic factual information about what an agency proposes to do. *State of Cal. ex rel. Lockyer v. FERC*, 329 F.3d 700, 708 (9th Cir. 2003) [hereinafter "*Lockyer*"]. "An interested member of the public should be able to read the published notice of [a rulemaking] and understand the 'essential attributes' of that [rulemaking] . . . . A member of the public should not have to guess the [agency's] 'true intent.'" *Id.* at 707.

Empire argues that the Secretary did not provide adequate notice under the APA regarding the impact the policy would have on Medicare Secondary Payer patient-days by removing the word "covered" from 42 C.F.R. § 412.106(b), and that interested parties were entitled to know that the proposed change would impact both kinds of patient-days. *See* ECF No. 34 at 20. The Secretary contends that notice was adequate because the two policies delineated in the 2003 Notice of Proposed Rulemaking encompassed both dual-eligible and Medicare Secondary Payer patient-days, and interested parties should have known that the proposed change would impact both kinds of patient-days. ECF No. 46 at 30. The Secretary argues that the legal question is only whether notice was adequate despite the Secretary's misstatement about the agency's current policy.

In support of his adequate notice argument, the Secretary argues that he received a number of comments opposing the 2003 proposed rule and supporting the policy that the Secretary inaccurately described as the agency's then-existing

policy, and that he provided an explanation for the rule ultimately adopted in the 2005 Final Rule.  *See* 69 Fed. Reg. 49,098-99 (Aug. 11, 2004).  The Secretary asserts that the comments that he received indicated that interested parties understood that a change in the policy relating to dual-eligible beneficiaries in the Medicare fraction was under consideration, and therefore that they meaningfully participated in the notice-and-comment process.  *See* ECF No. 46 at 30.  This, the Secretary contends, is sufficient to demonstrate that the Secretary provided notice sufficient to comply with the APA.  *See* ECF No. 46 at 27-30.

The Court observes that Medicare is a particularly complex regulatory system, with many interrelated rules which may have significant impacts on both Medicare recipients and health care providers.  In many administrative regimes, like Medicare, extensive administrative costs may be associated with the implementation of any policy change.  The Court notes that many of the commenters who opposed the proposed change expressed concern for the administrative burden and costs that would be associated with implementing the proposed change.  *See supra* Part II.A.  Therefore, it is possible that the same commenters who expressed opposition to the Secretary's 2003 notice of proposed rulemaking would have expressed similar opposition to any proposed change in the Secretary's policy regarding dual-eligible patient-days.  For example, one commenter, AHA, opposed the Secretary's proposed change, stating that "the

calculation of dual-eligible days must not be changed." AR at 754-55R.However, when the AHA argued against a change in policy, AHA took at face value the Secretary's statement of the agency's then-existing policy, AR at 81R, leading the Court to ask: Which policy was AHA advocating, the policy that the Secretary actually maintained at the time or the policy that the Secretary inaccurately stated that it maintained?

The Court finds that when the Secretary misstated the agency's then-existing policy and then failed to provide additional notice and time to comment after the Secretary corrected his misstatement, the Secretary's misstatement undermined the validity of the notice, making it insufficient "to provide the public with a meaningful 'opportunity to comment on [the proposed] provisions.'" *Hall v. United States iEPA*, 273 F.3d 1146, 1162 (9th Cir. 2001). The Court finds that interested parties could not have understood the essential attributes of the proposed rule when the Secretary and the agency misunderstood and misstated them. *See Lockyer*, 329 F.3d at 707; *see also NRDC*, 279 F.3d at 1186 (stating that one of the key considerations is "whether a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule"). In addition, it is undisputed that the Secretary did not provide a 30-day period to receive comments, as required by 5 U.S.C. § 553(b), after the Secretary corrected his prior misstatement.

1    In this case, the Court finds that a new round of notice and comment would

2    have provided the first meaningful opportunity for interested parties to offer

3    comments.  In order to preserve the democratic process we value so highly, it is

4    important to allow people to understand the actual issues being considered.  When

5    the Secretary misstated the then-existing policy, potential commenters could have

6    been lulled into thinking that they did not have to comment.  If the Secretary had

7    made an accurate statement of the then-existing policy, certain commenters who

8    did not file comments may have had the impetus to file a comment in order to

9    affect the Secretary's promulgation of the rule.  In fact, during the 2003 comment

10   period, at least two commenters noted that they were confused by the Secretary's

11   prior misstatement, *see infra* Part II.A.2.  After the Secretary issued the notice

12   correcting the policy statement in 2004, at least one commenter expressly stated

13   that it had relied upon the Secretary's statement of the agency's policy when

14   drafting its initial comments.  *See infra* Part II.A.5.  Additionally, after the

15   Secretary published the notice regarding the misstatement of the agency's policy,

16   the commenter, Federation of American Hospitals ("FAH"), urged the Secretary to

17   continue to accept comments on this issue.  *Id.*

18        Another aspect of adequate notice courts consider is whether the final rule is

19   a logical outgrowth of the proposed rule.  *See Rybachek*, 904 F.2d at 1288.  In the

20   case of *Long Island Care at Home v. Coke*, the Supreme Court considered a

21

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT, AND DENYING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT ~ 50

proposed rule subjecting certain individuals to wage and hour rules. *Id.*, 551 U.S. 158 (2007). "The clear implication of the proposed rule was that companionship workers employed by third-party enterprises that *were not* covered by the [Fair Labor Standards Act ('Act')] prior to the 1974 Amendments . . . *would* be included within the [new rule]." *Id.* at 174-75 (emphasis in original). The agency then withdrew the proposal and promulgated its final rule. "The result was a determination that exempted *all* third-party-employed companionship workers from the Act." *Id.* at 175. Concluding that the final rule was a logical outgrowth of the proposed rule, the Supreme Court stated, "We do not understand why such a possibility was not reasonably foreseeable." *Id.* Likewise, the Secretary argues that the agency's proposed rule created a reasonably foreseeable outcome. ECF No. 46 at 30. However, in *Long Island Care*, the interested parties could reasonably foresee the final rule because the agency accurately stated its then-existing policy and proposal. *See Long Island Care at Home*, 551 U.S. at 174-75. In this case, interested parties could not reasonably foresee the final rule because of the Secretary's misstatement about the agency's then-existing policy.

Despite the Secretary's failure to accurately state the agency's then-existing policy or to provide additional time for notice and comment after correcting his misstatement, the Secretary argues that the 2003 Notice of Proposed Rulemaking put interested parties on notice that either of the two options mentioned might be

adopted.  *See* ECF No. 48 at 15; *see also Stringfellow Memorial Hosp. v. Azar*,

Civil Action No. 17-309 (D.D.C. June 29, 2018) (stating that the "2004 Proposed

Rule thus put parties on notice that either of these two options might be adopted").

The Secretary argues that the 2005 Final Rule is a logical outgrowth of the 2003

and 2004 Notices of Proposed Rulemaking because the Secretary decided not to

adopt the proposed change and, instead, adopted its stated policy.  ECF No. 46 at

27-29.  Citing an out-of-circuit case, the Secretary argues that "[a]n agency's

'refusal to adopt its proposed' rule is always a logical outgrowth of the proposal."

*Id.* at 28 (quoting *Envt'l Integrity Proj. v. EPA*, 425 F.3d 992, 997 (D.C. Cir.

2005)).

      The Court finds the Secretary's argument illogical in this case, where the

Secretary misstated the agency's then-existing policy and failed to remedy its

misstatement until approximately three days before the close of the 2004 comment

period.  The argument that an agency's refusal to adopt a proposed rule is a logical

outgrowth of the proposal might be true when the agency's statement of its then-

existing policy and its proposal are both accurate.  Here, however, where the

Secretary misstated the agency's then-existing policy, the Court finds that the

Secretary's refusal to adopt the agency's proposed rule cannot be presumed to be a

logical outgrowth of the proposal, because the inaccuracy of the policy statement

necessarily distorts the context of the proposed rule.  Without an accurate context

1  in which to view the Secretary's proposed rule, interested persons cannot know

2  what to expect and have no basis on which to make their comments.

3      The Court concludes that where interested parties did not have accurate

4  notice of the then-existing policy and the potential change that the rule would

5  effect, the interested parties are deprived of a meaningful opportunity to comment.

6  The Court also concludes that interested parties could not have reasonably

7  anticipated the Secretary's final rulemaking where the Secretary's notice of

8  proposed rulemaking contained a misstatement of then-existing agency policy.  *See*

9  *NRDC, Inc. v. United States EPA*, 863 F.2d 1420, 1429 (9th Cir. 1988).  The Court

10  finds that a new round of notice and comment would provide the first opportunity

11  for interested parties to offer meaningful comments in this case.  *See NRDC*, 279

12  F.3d at 1186.  Therefore, the Court finds that the 2005 Final Rule is not a logical

13  outgrowth of the 2003 Notice of Proposed Rulemaking, and that the Secretary's

14  notice was inadequate to satisfy the procedural rulemaking requirements of the

15  APA.

16      *C. Harmless Error Rule*

17      Because the Court has found that the Secretary's notice was inadequate and

18  that the 2005 Final Rule was not a logical outgrowth of the proposed rule, the

19  Court is obligated to take "due account . . . of the rule of prejudicial error."  5

20  U.S.C. § 706(2); *see also Rybachek*, 904 F.2d at 1295.  "To avoid gutting the

21

1    APA's procedural requirements, harmless error analysis in administrative

2    rulemaking must therefore focus on the process as well as the result." *Riverbend*

3    *Farms, Inc. v. Madigan*, 958 F.2d 1479, 1487 (9th Cir. 1992).

4         The Ninth Circuit has held that "the failure to provide notice and comment is

5    harmless only where the agency's mistake 'clearly had no bearing on the procedure

6    used or the substance of the decision reached.'" *Id.* (quoting *Sagebrush Rebellion,*

7    *Inc. v. Hodel*, 790 F.2d 760, 764-65 (9th Cir. 1986)).  Otherwise, a failure to

8    comply with APA requirements is harmful and prejudicial and in violation of the

9    APA.  *See* 5 U.S.C. § 706(2).  The Ninth Circuit quoted the United States Supreme

10   Court's approach to harmless error, in which the party "seeking to reverse the

11   result of a civil proceeding will likely be in a position . . . to explain how he has

12   been hurt by an error." *See Cal. Wilderness Coalition v. United States DOE*, 631

13   F.3d 1072, 1091 (9th Cir. 2011) (quoting *Shinseki v. Sanders*, 129 S. Ct. 1696,

14   1706 (2009)).  The Ninth Circuit concluded that the Supreme Court's approach is

15   consistent with the Ninth Circuit's harmless error standard. *Id.* at 1091-92.

16        The Ninth Circuit has found agency error harmless in several cases.  An

17   error was harmless when an agency failed to comply with APA notice-and-

18   comment requirements but held hearings in compliance with another federal

19   statute. *See Sagebrush Rebellion, Inc.*, 790 F.2d at 763.  When an agency erred in

20   applying the good cause exception to the APA's notice-and-comment

21   

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT, AND DENYING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT ~ 54

requirements, the court found harmless error because all the parties knew the ground rules and process, which has been in place for a decade. *See Riverbend Farms, Inc.*, 958 F.2d at 1485. Finally, the court found harmless error when an agency published a final determination early because it had complied substantially with all of the other APA requirements and there was no prejudice as a result of the error. *County of Del Norte v. United States*, 732 F.2d 1462 (9th Cir. 1984).

However, this case presents a different set of facts. The Court finds that the Secretary's late announcement of its misstatement on the CMS website, without providing publication in the Federal Register or any additional opportunity for public comment, undermined the substance of the decision reached because the Secretary did not have the benefit of useful comments by interested parties. *See Riverbend Farms, Inc.*, 958 F.2d at 1487. Furthermore, direct injury occurred. The Hospital was injured because of lack of reimbursement, *see* ECF No. 1, and the lack of reimbursement is because of the 2005 Final Rule that was promulgated without sufficient notice.

Therefore, the Court concludes that the Secretary's misstatement undermined the notice requirement under the APA to the extent that the Secretary provided inadequate, inaccurate notice in the 2003 and 2004 notices of proposed rulemaking and insufficient opportunity for meaningful comment after the

Secretary corrected his misstatement. The Court finds that the Secretary's error was not harmless.

In conclusion the Court finds that although 42 C.F.R. § 412.106(b)(2) is substantively valid, it is procedurally invalid under the APA because the Secretary's notice and comment opportunity was inadequate and that the 2005 Final Rule was not a logical outgrowth of the proposed rule. The Court grants summary judgment in favor of Empire, and vacates the amendment of 42 C.F.R. § 412.106(b)(2) in the 2005 Final Rule. The Court enjoins the Secretary from applying to the Plaintiff Hospital for the 2008 fiscal year the 2005 Final Rule policy that unpaid Medicare Part A days are patient-days "entitled to benefits under [Medicare] part A" for the purposes of assessing the Medicare fraction of the DPP. The Court directs the Secretary to calculate the Plaintiff Hospital's DSH payment consistent with this Order and to make prompt payment of any additional amounts due to the Plaintiff Hospital plus interest calculated in accordance with 42 U.S.C. §1395oo(f)(2).

**III. Empire's Challenge to the Secretary's Assessment of SSI Entitlement**

Empire argues that the Secretary's "decision to include in the DSH calculation only those limited [SSI] beneficiaries receiving a cash SSI payment runs counter to the plain language of the DSH statute and Congress's intent to have Medicare-entitled SSI enrollees serve as a proxy for low-income patients." ECF

No. 34 at 30.  Therefore, Empire argues, the Secretary's policy of using Social

Security Administration payment codes to determine SSI benefit recipients is

contrary to the DSH statute and regulation and "actually provides a *less* reliable

index of the poverty of the population served by a given hospital."  *Id.* at 31

(emphasis in original).  Empire argues that the Secretary's SSI policy is due no

*Chevron* deference, and that the Secretary's "interpretation to exclude unpaid SSI

days from the DSH calculation is invalid under 5 U.S.C. § 706(2).  *Id.* at 31-32.

The Secretary contends that the Board did not grant the Court jurisdiction to

review the Secretary's policy regarding the methodology for identifying patients

"entitled to SSI benefits."  ECF No. 46 at 32-33.  The Secretary argues that the

Board's grant of expedited judicial review is narrow and limited in its scope to "the

legal question" of "whether . . . 42 C.F.R. § 412.106(b)(2) is valid."  *Id.* at 32.

The Medicare fraction in 42 C.F.R. § 412.106(b)(2) refers to SSI

entitlement, and, therefore, the Secretary's interpretation of the phrase "entitled to

[SSI] benefits" in 42 U.S.C. § 1395ww(d)(5)(F)(vi) arguably falls within the scope

of this Court's expedited judicial review.  However, the Court finds that Empire

challenges the Secretary's policy regarding the determination of which individuals

are entitled to SSI benefits, which is not adopted as a substantive rule and which

does not relate to the specific legal question of the validity of 42 C.F.R. §

412.106(b).  Instead, Empire asks this Court to determine whether the Secretary's

policy regarding the determination of which individuals are entitled to SSI benefits is valid, which is not within the scope of the Board's grant for expedited judicial review. Empire's attempts to frame the SSI entitlement issue in terms of the DPP provision fail. Accordingly, the Secretary's policy regarding the assessment of SSI entitlement falls outside the scope of the Court's jurisdiction in this matter and will not be addressed by the Court.

### IV. Empire's Medicare Part C Challenge

Empire also challenges the validity of the inclusion of Part C coverage days in the Hospital's 2008 fiscal year DSH calculation. ECF No. 1 at 11. Both the Hospital and the Secretary have agreed that this Court should remand the Part C issue back to the Board. Accordingly, the Court remands the determination of the validity of the inclusion of Part C coverage days in the Hospital's 2008 fiscal year DSH calculation to the Provider Reimbursement Review Board.

Accordingly, **IT IS HEREBY ORDERED**:

1. Plaintiff's Motion for Summary Judgment, **ECF No. 34**, is **GRANTED IN PART** as to Empire's procedural claims and **DENIED IN PART** as to Empire's substantive claims, SSI-entitlement assessment claim, and Medicare Part C claim.

2. Defendant's Cross-Motion for Summary Judgment, **ECF No. 46**, is **DENIED**.

3. Plaintiff's challenge to the validity of the assessment of Medicare Part C days is remanded to the Provider Reimbursement Review Board.

4. The Court directs the Secretary to calculate the Plaintiff Hospital's DSH payment for the 2008 fiscal year consistent with this Order and to make prompt payment of any additional amounts due to the Plaintiff Hospital plus interest calculated in accordance with 42 U.S.C. §1395oo(f)(2).

5. For the purposes of assessing the Medicare fraction of the disproportionate patient percentage for the Plaintiff Hospital, the Court enjoins the Secretary from applying the policy adopted in the 2005 Final Rule that unpaid Medicare Part A days are "days entitled to benefits under [Medicare] part A."

6. Judgment shall entered for **Plaintiff**.

7. The Parties shall each bear their own costs.

The District Court Clerk is directed to enter this Order, **enter judgment accordingly**, provide copies to counsel, and **close this case**.

**DATED** August 13, 2018.


        *s/ Rosanna Malouf Peterson*
        ROSANNA MALOUF PETERSON
        United States District Judge